UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Court File No. 20-cr-270 (ECT/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| ANDREW CHARLES WELSH, | |
| Defendant. | |

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Andrew Charles Welsh's ("Defendant") Motion to Suppress Statements. [Docket No. 27]. The Court held a Motions Hearing on May 24, 2021, regarding the parties' pretrial motions at which the parties requested the opportunity to submit supplemental briefing on the present Motion. The supplemental briefing was completed on July 9, 2021, after which Defendant's Motion to Suppress Statements, [Docket No. 27], was taken under advisement.[1]

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 27], be **DENIED**.

I.  **Background and Statement of Facts**

   A.  **Background**

Defendant is charged with one count of arson, in violation of 18 U.S.C. § 844(i), one count of use of fire to commit a federal felony, in violation of 18 U.S.C. § 844(h)(1), and one count of wire fraud, in violation of 18 U.S.C. § 1343. (Indictment [Docket No. 1]).

---

[1] The Court addressed the parties' pretrial discovery motions by separate Order. [Docket No. 42].

**B. Facts**

Defendant owns the Press Bar and Parlor in Saint Cloud, Minnesota (the "Press Bar"). (Tr. [Docket No. 43], at 15). On February 17, 2020, the Saint Cloud Fire Department and Police Department responded to a fire at the Press Bar. (Id. at 14–15). Defendant subsequently gave several voluntary statements about the fire to law enforcement prior to his arrest. (Id. at 26, 33–34).

On February 29, 2020, Defendant was arrested at his residence in Sauk Rapids, Minnesota. (Id. at 17, 23, 32). Approximately ten to fifteen uniformed law enforcement officers were present during his arrest. (Id. at 23–24). Those law enforcement officers had their guns drawn while Defendant was being arrested. (Id. at 23). After being arrested, Defendant was transported in a squad car to the Saint Cloud Police Department. (Id. at 24).

Also on February 29, 2020, approximately one-and-a-half to two hours after his arrest, Special Agent Brian Kempa with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("SA Kempa"), along with Saint Cloud Police Investigator Derrick Peters ("Investigator Peters"), interviewed Defendant at the Saint Cloud Police Department. (Id. at 15, 32; Gov't's Ex. 3, at 13:40). The entire interview was recorded.[2]

At the outset of the interview, Investigator Peters informed Defendant of his rights as follows:

> Uh, so before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to an attorney before being questioned and have the attorney present during questioning. If you cannot afford to hire an attorney, one will be appointed without cost to you before questioning if you wish.

---

[2] At the Motions Hearing, the Government, without objection, offered an audio recording, transcript, and video recording of the February 29, 2020, interview into evidence as Government Exhibits 1, 2, and 3, respectively. (Id. at 12).

(Gov't's Ex. 2, at 2). Investigator Peters then asked Defendant, "Do you understand what I just read you Andy?" (Id.). Defendant clearly responded, "yes." (Id.).

The interviewers and Defendant then engaged in the following interaction:

> Q   Having these rights in mind, do you wish to talk to us right now?
> A   Um, to a certain extent, you know. I've been forthcoming and honest every time I've been questioned, but—
>
> Q   Okay.
> A   --I don't like what's going on right now. You know?
>
> Q   Okay.
> A   I mean, you guys could have called me, I would of came down here. Um, just not very happy how this was handled.

(Id.). The Interviewers then immediately proceeded to inquire into whether Defendant would sign tax release forms, and the following interaction occurred:

> Q   Okay. Um, so what-what <u>I'd like to start with, um, these are releases for tax returns</u>.
> A   Mm-hmm (affirmative response).
>
> Q   So it'd be for, um, yourself as an individual, and then the companies to the bars. So Timeless, and um—
> B   Horseshoe.
> Q   --Horseshoe.
> A   Mm-hmm (affirmative response).
>
> Q   Would you, um (indiscernible)—
> A   (indiscernible) I would like to talk to an—I-<u>I would like to talk to an attorney first for that stuff</u>, you know—
>
> Q   Okay.
> A   I don't see any reason, but I'm not a lawyer.
>
> Q   Okay.
> A   I don't think any reason not to, but I don't (indiscernible) a lawyer.
>
> Q   Okay.
> A   You know.

> Q   Nope, that's fine. And we can leave these with you so you can—you can talk to a lawyer about that—
> A   Okay.
>
> Q   At a later time, okay? Um, and-and I know that you were—they talked to you, un, a couple times I believe.
> A   Yep—
>
> Q   Af—right-right after the fire. So in this week since, an-any more thoughts about-about the fire?
> A   Uh, I mean, that's all I think about. You know—
>
> Q   Okay.
> A   --what the hell could of happened. I mean, that place was my everything, you know. So it's just—it's-it's hard. Frustrating. You know—

(Id. at 2–3) (emphasis added).

Nothing further was said about the tax information. The interviewers subsequently questioned Defendant about the circumstances surrounding the fire and about the Press Bar generally. (See, Id. at 3–17). Eventually, the interviewers informed Defendant that they found ignitable liquid residue on his desk downstairs at the Press Bar, that they had been informed the Press Bar had financial issues, and that they knew Defendant was the last person to leave the Press Bar before the fire occurred. (Id. at 17). Only at that point did Defendant indicate that he was done talking to the interviewers about any topic. (Id.). The interviewers then ended the interview and informed Defendant that he was going to be taken to Stearns County Jail and booked for arson. (Id. at 18).

Throughout the interview's recording, the interviewers can be heard maintaining a conversational tone without raising their voices to yell or threaten Defendant. Likewise, Defendant maintained a conversational tone, and he was clearly cooperative and self-assured throughout the interview. Defendant also responded appropriately to any questions presented.

**II.     Defendant's Motion to Suppress Statements. [Docket No. 27].**

Defendant now moves the Court for an Order suppressing the statements made by him during the February 29, 2020, interview conducted by law enforcement at the Saint Cloud Police Department while Defendant was in custody. (Def.'s Mot. to Suppress Statements [Docket No. 27]).

In support of the present Motion, Defendant contends that his statements made during the recorded February 29, 2020, interview were not proceeded by a knowing, intelligent, and voluntary waiver of his Miranda rights. (Mem. in Supp. [Docket No. 47], at 2, 15–18). Defendant further contends that during the February 29, 2020, interview he invoked his right to counsel, but the interviewers continued to question him anyways. (Id. at 2, 11–15). Therefore, Defendant argues that all of his statements made during the entire February 29, 2020, interview should be suppressed. (Id.).

**A. Standard of Review**

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).

A defendant is entitled to a Miranda warning prior to custodial interrogation. Miranda, 384 U.S. at 444–45. "Interrogation under Miranda includes not only express questioning but also its

functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)). Whether an incriminating response is sought by an officer is determined "from the perspective of the suspect" and not by the officer's actual intent. United States v. Richardson, 427 F.3d 1128, 1132 (8th Cir. 2005).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. "If the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him." Davis v. United States, 512 U.S. 452, 458 (1994) (citing North Carolina v. Butler, 441 U.S. 369, 372–76 (1979)). "But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." Id. (citing Edwards v. Arizona, 451 U.S. 477, 484–85 (1981)). However, to invoke a suspect's right to an attorney and end questioning, a suspect's request for an attorney must be clear and unambiguous. Id. at 459. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," then the interrogation may continue. Id. (emphasis in original) (citing McNeil v. Wisconsin, 501 U.S. 171, 178 (1991); Edwards, 451 U.S. at 485)). The test of whether a defendant has invoked his right to counsel is an objective one. Davis, 512 U.S. at 458–59.

In addition, a suspect in an interrogation may invoke a limited right to have counsel present only for certain actions or areas of questioning. See, Connecticut v. Barrett, 479 U.S. 523, 529 (1987). "[A] limited invocation of the right to counsel does not preclude the admissibility of

statements a defendant makes which fall outside the limited invocation." <u>United States v. Boyer</u>, 914 F.2d 144, 146 (8th Cir.1990) (citing <u>Barrett</u>, 479 U.S. 523).

### B. Analysis

#### i. Waiver of Rights

Defendant contends that all of his statements made during the recorded February 29, 2020, interview were custodial and were not proceeded by a knowing, intelligent, and voluntary waiver of his <u>Miranda</u> rights. (Mem. in Supp. [Docket No. 47], at 2, 15–18).

As noted above, <u>Miranda</u> warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" <u>Stansbury</u>, 511 U.S. at 322 (quoting <u>Miranda</u>, 384 U.S. at 444). To be subject to suppression under <u>Miranda</u>, a statement must be made while in custody and in response to interrogation. <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009) (citing <u>United States v. Londondio</u>, 420 F.3d 777, 783 (8th Cir. 2005)). A defendant may nevertheless waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." <u>Miranda</u>, 384 U.S. at 444.

It is undisputed that the questioning of Defendant during the recorded February 29, 2020, interview constituted interrogation. (<u>See</u>, Mem. in Supp. [Docket No. 47]; Mem. in Opp'n [Docket No. 50]). It is also undisputed that Defendant was in custody during the recorded interview. (<u>See</u>, Mem. in Supp. [Docket No. 47]; Mem. in Opp'n [Docket No. 50]). In addition, the transcript, as well as, audio and video recordings of the interview clearly demonstrate that Defendant was read a <u>Miranda</u> warning before the interview began, and that he verbally acknowledged that he understood the rights warning. (Gov't's Ex. 2, at 2).

Defendant first contends that he "did not waive his rights." (Mem. in Supp. [Docket No. 47], at 15). Specifically, Defendant contends that there was no waiver because when Investigator

7

Peters asked Defendant if he wished to talk to the interviewers, Defendant's response "was, at best, ambiguous."[3] (Id.). Nevertheless, in the absence of an express statement of waiver, "courts can infer a waiver of Miranda rights 'from the actions and words of the person interrogated.'" Burghuis v. Thompkins, 560 U.S. 370, 387 (2010) (quoting Butler, 441 U.S. at 373); see also, United States v. House, 939 F.2d 659, 663 (8th Cir. 1991) ("[W]aiver may be inferred from the fact that the defendant responded to questions posed by the interviewer after being advised of his rights."). In the present case, Defendant clearly waived his Miranda rights by responding to the interviewers' questions after being advised of, and acknowledging that he understood, those rights.

Defendant next contends that even if he did waive his Miranda rights, that waiver was not knowing, intelligent, and voluntary. The validity of a Miranda waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

---

[3] Defendant also contends that he did not waive his rights because he requested an attorney "in response to law enforcement's first topic thereafter—and less than a minute after the Miranda discussion—[Defendant] informed law enforcement that he wanted to talk to an attorney before answering questions." (Id.). The Court will address Defendant's request for an attorney in the next section of this report and recommendation. Importantly, as explained below, Defendant's request for an attorney was limited to only the narrow issue of providing tax releases. See, Infra.

### 1. Voluntariness

Courts assess whether a waiver of rights pursuant to Miranda was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." United States v. Contreras, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

Defendant contends that his waiver was not voluntary because he "was arrested at gunpoint by 10–15 uniformed officers and then interrogated in an interview room at the police station." (Mem. in Supp. [Docket No. 47], at 17). However, the interview occurred approximately one-and-

9

a-half to two hours <u>after</u> Defendant's arrest. <u>See</u>, <u>United States v. Nguyen</u>, 250 F.3d 643, 644–45 (8th Cir. 2001) (finding that "[t]here was sufficient distance in time and place from the flash-bang explosion for him to have knowingly and voluntarily waived his <u>Miranda</u> rights" where there was approximately an hour and ten minutes between the use of a flash-bang device during the defendant's arrest at his residence and his interrogation at a police station). And, more importantly, the mere fact that Defendant was arrested by several armed law enforcement officers does not render his subsequent waiver or statements involuntary unless the overall impact of the interview caused his will to be overborne. <u>See</u>, <u>United States v. Carranza</u>, 39 Fed. App'x 464, 465 (8th Cir. 2002) (finding waiver was voluntary "although [the defendant] was arrested in a police-dominated atmosphere, having been apprehended and handcuffed at gunpoint").

The Court's review of the totality of the circumstances shown in the present record does not indicate that Defendant's will was in any way overborne. Nothing in the present record indicates that the environment in which the interview actually occurred was inherently coercive, nor that the interviewers engaged in any threatening or coercive tactics during the interview.

The February 29, 2020, interview was conducted in a standard police interrogation room at the Saint Cloud Police Department. (Tr. [Docket No. 43], at 25). Although the door to the interview room was closed, there were only two officers present. (<u>Id.</u> at 24–25). Defendant was not handcuffed during the interview. (<u>Id.</u> at 15–16; <u>see also</u>, Gov't's Ex. 3). Before the interview, Defendant was provided with two bottles of soda, which he drank at times during the interview. (Gov't's Ex. 3). Further, the interview also only lasted for approximately twenty-six minutes, thus it was not coercive in duration. <u>See, e.g.</u>, <u>United States v. Makes Room</u>, 49 F.3d 410, 415 (8th Cir. 1995) (noting that interrogation lasting more than two hours was not coercive in duration).

10

The transcript and recordings of the February 29, 2020, interview clearly and readily demonstrate that the interviewers did not engage in threatening or coercive tactics to induce his rights waiver or any of his statements. The interview was conducted in a conversational tone, and the interviewers made no threats or promises to Defendant. See, United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); see also, Makes Room, 49 F.3d at 415 (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). Moreover, the fact that Defendant was able to partially invoke his right to counsel on the initial, narrow issue of providing tax releases, as discussed below, and to eventually indicate that he was done talking entirely to the interviewers, also demonstrates that his will was not overborne.

Therefore, on the present record, the Court concludes that Defendant's waiver of his Miranda rights prior to the February 29, 2020, interview was voluntary.

### 2. Knowing and Intelligent

Next, the Court must consider whether Defendant's waiver of his rights prior to the interview on February 29, 2020, was knowingly and intelligently made. Vinton, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his rights and presence of mind during the February 29, 2020, interview (as well as throughout the remainder of the interview) consists of the hearing testimony of SA Kempa, and the transcript, audio recording, and video recording of the February 29, 2020, interview. Defendant does not offer any specific argument that his February 29, 2020, rights waiver pursuant to Miranda was anything other than knowingly and intelligently made. (See, Mem. in Supp. [Docket No. 47]).

On the present record, the Government offers sufficient evidence related to the February 29, 2020, recorded interview of Defendant for the Court to determine that Defendant's initial waiver of his Miranda rights prior to that interview was not only voluntary, but it was also knowingly and intelligently made.

The present record clearly demonstrates that Defendant was read a Miranda warning before the interview began, and he verbally acknowledged that he understood the rights warning. Nothing in the present record indicates that Defendant displayed any signs of confusion or an inability to understand his rights. As already noted, Defendant talked openly and clearly for the duration of the interview. Defendant provided appropriate and responsive answers to the questions posed. And there is no indication that Defendant was under the influence of drugs or alcohol or otherwise impaired such that he would have been unable to understand his rights.

Therefore, on the present record, the Court concludes that Defendant's waiver of his Miranda rights prior to the February 29, 2020, interview was done both knowingly and intelligently.

### ii. Invocation of Right to an Attorney

Defendant contends that during the February 29, 2020, interview he invoked his right to counsel. (Mem. in Supp. [Docket No. 47], at 2, 11–15). Defendant further contends that despite his invocation of his right to counsel, law enforcement continued to question him in violation of Miranda. (Id.).

If after a valid rights waiver, "an accused who is in custody 'expresse[s] his desire to deal with the police only through counsel,' he shall not be 'subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" United States v. Jackson,

852 F.3d 764, 770 (8th Cir. 2017) (alteration and emphasis in original) (quoting Edwards, 451 U.S. at 484–85. However, to invoke the right to an attorney and end questioning, a suspect's request for an attorney must be clear and unambiguous. Davis, 512 U.S. at 459. This is an objective inquiry which considers the circumstances surrounding the request. Id. at 458–59 (citing Barrett, 479 U.S. at 529).

A suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis, 512 U.S. at 459. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," then the interrogation may continue. Id. (emphasis in original) (citing McNeil, 501 U.S. at 178; Edwards, 451 U.S. at 485). Police officers have no obligation to clarify an ambiguous or equivocal statement made by a suspect. Id. at 461.

A suspect in an interrogation may also invoke a limited right to have counsel present only for certain actions or areas of questioning. See, Barrett, 479 U.S. at 529; Boyer, 914 F.2d at 146. Thus, "[i]ncluded in the inquiry of clear and unequivocal invocation is the question of whether the suspect limited his invocation to specific terms." United States v. Wetsch, No. 12-0045 (SRN/JJG), 2013 WL 1435228, at *27 (D. Minn. Feb. 8, 2013), report and recommendation adopted by 2013 WL 1435210 (D. Minn. Apr. 9, 2013). "[A] limited invocation of the right to counsel does not preclude the admissibility of statements a defendant makes which fall outside the limited invocation." Boyer, 914 F.2d at 146 (citing Barrett, 479 U.S. 523).

Here, SA Kempa indicated to Defendant that they would like to begin the February 29, 2020, interview by discussing releases for Defendant's personal and business tax returns. (Gov't's

13

Ex. 2, at 2). Defendant then stated: "I would like to talk to an—I-I would like to talk to an attorney first <u>for that stuff</u>, you know— . . . I don't see any reason, but I'm not a lawyer. . . . I don't think any reason not to, but I don't (indiscernible) a lawyer." (<u>Id.</u> at 3) (emphasis added). Defendant's statement objectively did <u>not</u> unequivocally indicate that he wanted <u>all</u> questioning as to all topics to cease until he spoke with an attorney. Rather, Defendant's inclusion of the phrase "for that stuff" clearly and objectively indicated that his request for an attorney was narrowly limited to the initial topic of tax return releases. <u>See, e.g.</u>, <u>United States v. May</u>, No. 14-136 (JRT/LIB), 2014 WL 6775283, at *10 (D. Minn. Dec. 2, 2014) (emphasis added) (finding the defendant's statement, *"*I ain't gonna tell my story without my lawyer <u>on that part</u>," objectively indicated that his invocation was limited to certain topics).

Furthermore, SA Kempa quickly acknowledged Defendant's limited request for an attorney by stating, "Nope, that's fine. And we can leave these with you so you can—you can talk to a lawyer about that—." (<u>Id.</u>). The limited nature of Defendant's request is emphasized by the fact that he then simply stated, "Okay," without objectively indicating in any way whatsoever that he wished to speak with an attorney before all further questioning. (<u>Id.</u>). The limited nature of Defendant's request is further emphasized by the fact that he never actually requested an attorney be present at any other point during the February 29, 2020, interview. (<u>See</u>, Gov't's Exs. 1–3). Nothing in the record now before this Court indicates that the interviewers revisited the topic of Defendant's tax returns during the February 29, 2020, interview at any time after his limited invocation of his desire to consult with an "attorney first for that stuff[.]"

In short, Defendant's invocation of his right to counsel was objectively limited to only the narrow issue of providing tax releases, and the interviewers did not thereafter question Defendant further about that narrow topic. Therefore, the Court concludes that there is no basis to suppress

Defendant's subsequent statements which fell squarely outside the scope of his limited invocation. See, Boyer, 914 F.2d at 146; see also, United States v. Jacobs, 97 F.3d 275, 280 (8th Cir. 1996) (finding statements made after limited request for an attorney "in the event he had to take a polygraph test" were admissible because he was not subjected to a polygraph test); May, 2014 WL 6775283, at *11 (denying motion to suppress where the interviewers "did not subsequently ask questions about the limited areas Defendant said he would not talk about in the absence of counsel").

### III. Conclusion

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** Defendant's Motion to Suppress Statements, [Docket No. 27], be **DENIED** in its entirety.

Dated: August 3, 2021

s/Leo I. Brisbois
Leo I. Brisbois
U.S. MAGISTRATE JUDGE

### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.