UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-270 (ECT/LIB)

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
| ) | |
| Plaintiff,   ) | |
| ) | GOVERNMENT'S SENTENCING |
| v.   ) | MEMORANDUM |
| ) | |
| ANDREW CHARLES WELSH,   ) | |
| ) | |
| Defendant.   ) | |

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Nathan H. Nelson and Evan B. Gilead, Assistant United States Attorney, hereby respectfully submits its position and memorandum on sentencing.

## BACKGROUND

Faced with substantial debts, the defendant Andrew Welsh caused immense destruction and put lives at risk by starting a catastrophic fire in the basement of his bar, in an attempt to reap almost two million dollars in insurance proceeds.

In April 2016, the defendant and his then-wife (J.W.) purchased the Press Bar & Parlor, a tavern located in the historic center of downtown Saint Cloud, Minnesota. (PSR ¶¶ 7-8). Defendant purchased the bar from its prior owners on a contract for deed. (PSR ¶ 7). The total purchase price was $825,000. (*Id.*). Defendant put $100,000 down, with the balance to be paid in the form of: (1) a $50,000 lump sum payment due in October 2016, (2) $6,000 payments due monthly until April 2022, and (3) the remaining balance due in full in April 2022. (*Id.*).

Defendant operated the Press Bar for several years but struggled financially. He had substantial debts above and beyond the money owed on the bar, and he was going through a divorce with J.W. (PSR ¶ 17). Defendant had difficulty making his contractual payments on the bar. Specifically, he failed to make the $50,000 payment due in October 2016 and only made the payment two years later after the sellers began the process of cancelling the contract for deed. (PSR ¶ 7). The final payment on the bar due in April 2022 was expected to be much larger—with an anticipated total of about $457,000. (PSR ¶¶ 7, 17). Defendant had explored selling the bar but learned he would be unlikely to recover anything more than what he owed to the sellers on the establishment. (PSR ¶ 17). Not content to merely "break even," however, defendant instead planned the drastic step of burning down the bar in the hopes of turning a huge profit from the insurance proceeds.

In the early morning hours of February 17, 2020—after bar close—defendant went down to the basement office of the Press Bar. There, he used gasoline to set a fire on top of his desk. (ECF 86 pp. 2-3). Defendant then left the building and went home, leaving the fire to grow. Within twenty minutes, smoke began to appear on the streets of downtown Saint Cloud. (PSR ¶ 11). Ten minutes later, a fire alarm activated in an abutting building where a resident was sleeping upstairs. (*Id.*).

Firefighters responded and entered the Press Bar to locate and extinguish the fire. (PSR ¶ 13). They eventually made their way into the basement where they encountered a mature fire, which they unsuccessfully attempted to suppress. (*Id.*). The fire continued to spread, and they were forced to evacuate the building and

continue their suppression efforts from the outside.  (*Id.*)  Ultimately, the building was completely destroyed by the fire.  (*Id.*).





Although the surrounding buildings were saved from destruction, the fire at the Press Bar caused immense damage to the heart of downtown Saint Cloud—with the City and the surrounding businesses suffering millions of dollars in damage. (PSR ¶ 20).

Following the fire, defendant and J.W. submitted claims to the bar's insurer, Illinois Casualty Company, for a total of $1,960,376.71 in losses related to the fire. (PSR ¶¶ 15, 19). In the claims, defendant falsely represented to Illinois Casualty that he did not cause the fire at the bar. (PSR ¶ 18).

In November 2020, defendant was charged by grand jury with arson, wire fraud, and using fire to commit a federal felony. (ECF 1). On May 5, 2022, about two weeks before trial, defendant pleaded guilty to Count 1 of the Indictment charging him with Arson in violation of 18 U.S.C. § 844(i). (ECF 85-86).

On August 22, 2022, U.S. Probation issued a presentence investigation report ("PSR") in this matter. (ECF 100). Consistent with the parties' plea agreement, the PSR found that the base offense level for Count 1 was 27 based on defendant's conduct (1) involving a conscious or reckless risk of death or serious bodily injury to others, and (2) having an intended loss of more than $1,500,000. (PSR ¶ 26). After factoring in a two-level adjustment for acceptance of responsibility, the PSR calculated a total offense level of 24, together with a criminal history category of I, resulting in an advisory Guidelines range of 60-71 months' imprisonment with a mandatory minimum term of imprisonment of 60 months. (PSR ¶¶ 26-34, 43, 79-80).

Neither party has any objection to the PSR.

## THE GOVERNMENT'S POSITION ON SENTENCING

The only issue before the Court is what constitutes a reasonable sentence in light of the factors enumerated in Title 18, United States Code, Section 3553(a). In fashioning a sentence, Section 3553(a) requires the Court to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense; the need for deterrence; the need to protect the public from further crimes of the defendant; and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a). For the reasons stated below, a consideration of the factors listed in 18 U.S.C. § 3553(a) supports a sentence of 71 months, at the top of the advisory Guidelines range.

The nature of defendant's offense is extremely serious. Plainly stated, this is a crime motivated by greed. Although the defendant had financial troubles, he had legitimate means of dealing with them. He could have sold his bar and broken even. He could have surrendered the property back to the sellers on the contract for deed. He could have worked to renegotiate his debts. Failing all else, he could have declared bankruptcy. Instead of pursing a legitimate solution, however, defendant callously and selfishly opted to endanger the property and lives of others for his own profit.

As part of his scheme, defendant used gasoline to light a fire in the basement of his bar. Although he lit the fire in the early morning after his bar had closed, his actions still posed a tremendous risk of death or serious injury. This is not a case of arson of a building located in an isolated area, or one that stood alone buffered by open spaces such as parking lots. Rather, defendant's bar was in the heart of a

downtown business district. It was separated from a neighboring bar and restaurant by a narrow alley and shared a wall with another neighboring building containing a bar and apartments. In this type of setting, the use of fire as an implement of destruction is particularly dangerous because a fire, once ignited, cannot be directed or controlled. When defendant lit the fire using a powerful accelerant, it immediately posed a significant risk to those around it. For example, employees of the neighboring businesses were still in the process of closing their establishments and at least two residents were present in apartments in the adjoining building.

Perhaps most critically, however, the defendant's actions put the lives of the first responders at risk. Firefighters responding to the scene encountered an extremely dangerous situation. They did not know exactly where the fire was located or its intensity. As a result, they entered the smoke-filled main floor of the Press Bar essentially "blind," searching for the source of the smoke. That the fire was located in the *basement* is crucial because it was burning and weakening the underside of the main level floor from below as firefighters entered and began exploring the building. This created an increased risk of death from (for example) firefighters falling through a compromised floor, or of fire emerging from below in unexpected places cutting the firefighters off the exits. The fire was also extremely dangerous to those firefighters who eventually entered the basement to combat the blaze, because they were in a cluttered and confined space with only a single point of exit. Pre-fire photographs of the basement show the sole narrow stairway that firefighters had to use to enter and exit the basement and the spaces encountered upon reaching the basement landing:

6





Although thankfully no one was injured or died from the arson, defendant's actions were nonetheless tremendously destructive. The Press Bar and its contents were completely destroyed by the fire: leaving nothing to be salvaged and harming the sellers who were still owed $545,000 on the bar.[1] Surrounding establishments

---

[1] Pursuant to the insurance policy, the sellers were compensated by Illinois Casualty Company for the amounts that they were owed for the *building* in which

suffered millions in loses and saw their businesses needlessly disrupted just months before the pandemic would wreak further havoc on the commercial sector.  Finally, the City of Saint Cloud itself—in addition to incurring hundreds of thousands of dollars in losses—lost a 140-year-old structure and suffered a massive scar to the heart of its downtown.



Defendant wrought this destruction on his neighbors and the community for no purpose other than profit in his attempt to defraud his insurance company for $1.9 million.  In other words, firefighters risked their lives, businesses lost millions, and a community was scarred due solely to the defendant's greed.

---

the bar was located (about $393,102) but were not covered for the amount that they were still owed related to the sale of the Press Bar *business* and its personal property.

The remaining § 3553(a) factors do not outweigh the seriousness of the offense. Admittedly, the defendant does not have a significant criminal history. That fact, however, is already accounted for in the calculation of his Guidelines range and does not weigh heavily towards a sentence at the low-end of the range. Moreover, beyond defendant's lack of criminal history, his personal history and characteristics are, at best, equivocal. On the one hand, the government agrees that defendant's strong family support will be a great asset to him upon his release and reduce his risk of recidivism. On the other hand, however, the defendant's background does not meaningfully mitigate the seriousness of the offense. Unlike most of the people sentenced by this Court, defendant had many advantages in life, including a loving family and a relatively stable upbringing devoid of abuse, violence, or addiction. Thus, this is not a case where defendant's conduct can be attributed to a lack of guidance, past trauma, substance abuse, or other ills.

Finally, this case is distinguishable from the recent arson cases stemming from the 2020 civil unrest for several reasons. First, unlike many recent arson cases, the present offense involved some degree of premeditation and planning. Whereas the civil unrest arsons were committed by mobs in the heat of once-in-a-generation protests and riots, defendant's offense was part of a scheme to defraud that required calculated action and planning, such as bringing gasoline to the bar, finding an opportune moment to light the fire, and filing insurance claims. Second, defendant is *solely* responsible for the fire at the Press Bar, and the ensuing destruction would not have occurred but for his actions. This distinguishes the present case from many

9

of the civil unrest arsons, such as the third precinct arson (Crim. No. 20-181), which involved multiple actors, a mob mentality, and in some cases would have occurred with or without each individual defendant's participation.  Third and finally, this case differs meaningfully in the risk posed to the firefighters.  Unlike the present case, most of the civil unrest arsons did not involve firefighters actively entering a burning building to combat the blaze.

The specific cases cited by defendant from the District of Minnesota do not weigh in favor of a mandatory minimum sentence.  First, many of the cases cited involved people who received much *longer* sentences than the 71 months that the government seeks here.  Second, those cases involving sentences around or below 71 months are distinguishable both for the reasons stated above and because they had other mitigating factors not present here.  For example, Alexander Heil and Marc Gonzalez demonstrated extraordinary acceptance of responsibility by waiving indictment and pleading guilty within a month of being charged.  (Crim. No. 20-179, ECF 13; Crim. No. 20-180, ECF 11).  Matthew White also pled pre-indictment and had what the government described as a "troubled upbringing, struggles with addiction, and mental health diagnoses."  (Crim. No. 20-173, ECF 43 p. 5).  Samuel Frey and McKenzy Dunn joined others who were already stating fires, lit a fire that "self-extinguished," and had traumatic backgrounds and significant mental health issues.  (Crim. No. 20-129, ECF 85 pp. 4, 8-10, ECF 114 pp. 3, 10).  Garrett Ziegler and Fornandous Henderson both pleaded guilty pre-indictment and had substantial mitigating factors including significant substance abuse and mental health issues.

(Crim. No. 20-146, ECF 41 pp. 1-2; Crim. No. 20-188, ECF 47 pp. 3-6). Finally, Ryan Scharber lit fires, not in an urban environment, but on forest land and at a "storage garage," and pleaded guilty pre-indictment. *United States v. Scharber*, 772 F.3d 1147, 1149 (8th Cir. 2014).

In light of the elevated risk of death posed by defendant's conduct, the enormity of the property damage caused, the premeditated nature of the crime, and the profit motive, this Court should sentence the defendant to the top of the Guidelines range. A sentence of 71 months accounts for both the mitigating and aggravating aspects of defendant's personal history, while at the same time reflecting the seriousness of the offense, promoting respect for the law, providing just punishment for the offense, affording adequate deterrence, and protecting the public from further crimes of the defendant.

## CONCLUSION

For all the foregoing reasons, the United States respectfully recommends that the Court impose a sentence of 71 months' imprisonment.

Respectfully submitted,

Dated: September 14, 2022

ANDREW M. LUGER
United States Attorney

*/s/ Nathan H. Nelson*

BY:  NATHAN H. NELSON
Assistant U.S. Attorney
Attorney ID No. 0388713